IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AUDRA HARTMAN, individually, and as the Personal Representative of the Estate of Timothy Alan Hartman, deceased, and MONIKA C. SANDOVAL, individually, and as the Personal Representative of the Estate of Rickie D. Sandoval, deceased, <br><br>                Plaintiffs, <br><br>v. <br><br>THE UNITED STATES OF AMERICA, ROBINSON AVIATION (RVA), INC., a Foreign Corporation, OKLAHOMA CITY AIRPORT TRUST, a Public Trust, and THE CITY OF OKLAHOMA CITY, OKLAHOMA, <br><br>                Defendants. | Case No. CIV-10-197-L |

## **O R D E R**

This action arises from the March 4, 2008 crash of a Cessna jet aircraft just after takeoff from the Wiley Post Airport in Oklahoma City, Oklahoma, when the jet collided with a flock of American white pelicans over Lake Overholser. All five occupants of the jet aircraft, including plaintiffs decedents Timothy Alan Hartman and Rickie D. Sandoval, were fatally injured in the tragic crash. This matter is before the court on several motions.

First, the court considers the Motion to Dismiss filed by defendant United States of America **[Doc. No. 30]** in this action. Specifically, this particular motion seeks dismissal of plaintiffs' claims against the United States Department of

Agriculture ("USDA" or "Wildlife Services" or "WS").[1]  The motion states that the court lacks subject matter jurisdiction over these claims because they fail to state a claim upon which relief can be granted.  Alternatively, USDA asserts that these claims fall within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).  Plaintiffs filed a response to the motion opposing dismissal and the government filed a reply brief, all of which the court has carefully considered.  For the reasons stated below, the court finds that the Motion to Dismiss should be granted.

Federal courts are courts of limited jurisdiction and there is a presumption against federal court jurisdiction.  Basso v. Utah Power and Light Company, 495 F.2d 906, 909 (10th Cir. 1974) (citations omitted).  The party invoking the federal court's jurisdiction bears the burden of proof and has the duty to establish that federal jurisdiction does exist.  Id.  The party claiming federal court jurisdiction exists is required to show it by a preponderance of the evidence.  Celli v. Shoell, 40 F.3d 324, 327 (10th Cir. 1994).  Mere conclusory allegations of federal court jurisdiction are insufficient.  Penteco Corp. Ltd. Partnership - 1985A  v. Union Gas Sys. Inc., 929 F.2d 1519, 1521 (10th Cir. 1991).

Under Fed. R. Civ. P. 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In considering a

---

[1] Plaintiffs also seek damages from the United States based on allegations of negligence by employees of the Federal Aviation Administration.  These claims are not at issue in this Motion to Dismiss.

motion for dismissal under Rule 12(b)(6), the court assumes the truth of the plaintiff's well-pleaded factual allegations and views them in the light most favorable to the plaintiff. Beedle v. Wilson, 422 F.3d 1059, 1063 (10th Cir. 2005). In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1974 (2007). If the plaintiff fails to nudge its claims across the line from conceivable to plausible, the complaint must be dismissed. Id.

A motion to dismiss under Rule 12(b)(1) may take two forms. First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. Holt v. United States, 46 F.3d 1000, 1002 (10th Cir. 1995). In reviewing a facial attack on the complaint, the court accepts the allegations in the complaint as true. Id. Second, as is the case here, a party may go beyond the allegations of the complaint and challenge the facts upon which subject matter jurisdiction is based, *i.e.*, a factual challenge. Id. at 1003. When reviewing a factual attack on subject matter jurisdiction, the court does not presume the truth of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). Id. (citation omitted). In such a case, the court's reference to outside evidence does not convert the motion to a Rule 56 motion for summary judgment. Id.

Under the Federal Tort Claims Act ("FTCA"), the United States is liable in the

same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. The United States is liable for damages caused by the negligent wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). The court is to apply the substantive law of the place where the act or omission occurred. The parties agree that the substantive tort law of the state of Oklahoma would apply in this action with respect to plaintiffs' tort claims. To establish negligent liability for an injury under Oklahoma law, plaintiffs must prove that (1) defendants owed them a duty to protect them from injury, (2) defendants breached that duty, and (3) defendants' breach was a proximate cause of plaintiffs' injuries. Inglehart v. Bd. of County Comm'rs of Rogers County, 60 P. 3d 497, 502 (Okla. 2002). The threshold question for negligence is whether a defendant owes a plaintiff a duty of care. Id. This is a question of law. Id.

The FTCA's waiver of the federal government's sovereign immunity, outlined above, is limited by the discretionary function exception which states that the waiver of immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (emphasis added). In

4

determining the scope of the discretionary function exception, the Tenth Circuit has approved of the two-step test set forth by the Supreme Court in Berkovitz v. United States, 486 U.S. 531 (1988); Kiehn v. United States, 984 F.2d 1100, 1102 (10th Cir. 1993). The first step of the Berkovitz test requires the court to determine whether the challenged conduct "involves an element of judgment or choice," in which case it is discretionary and falls within the language of the exception, or whether it involves "a federal statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow," in which case the exception does not apply. Id., *citing* Berkovitz, 486 U.S. at 536. If the conduct involves discretionary judgment under the first step of Berkovitz, then the court applies the second step, which requires the court to "determine whether that judgment is the kind that the discretionary function exception was designed to shield." Id. The exception protects only those discretionary actions or decisions which are "based on considerations of public policy." Id., *citing* Berkovitz at 537. The purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id., *citing* Berkovitz at 536-37 (further quotation omitted). Factual issues concerning negligence are irrelevant to the threshold issue of whether the officials' actions are shielded from liability by the discretionary function exception. Allen v. United States, 816 F.2d 1417, 1421 (10th Cir. 1987).

Here, plaintiffs' complaint alleges that the USDA maintains an Animal and

Plant Health Inspection Service ("APHIS") which provides, under contract, wildlife damage management program services at civilian and military airports across the country, including Wiley Post Airport ("Wiley Post") and Will Rogers Airport ("Will Rogers") in Oklahoma City, "to reduce the threat posed by wildlife to aircraft, crew and passengers."  Complaint, Doc. No. 1, ¶ 3.  The complaint alleges that defendants Oklahoma City and Oklahoma City Airport Trust (collectively referred to as "OKC") operate three Oklahoma City airports, including Will Rogers and Wiley Post.  Id., ¶ 5.  Citing several statistics concerning bird strike hazards and their impact on aviation safety, the complaint alleges that the events reported in the Federal Aviation Administration's ("FAA's") Bird Strike Database, the findings of the 1998 USDA study, prepared under an agreement with OKC, and the continuous bird sightings in the operations area of Wiley Post were sufficient to trigger OKC's obligations to conduct a Wildlife Hazard Assessment ("WHA") under "Part 139.337(b)(4)."[2]  Id., ¶¶ 41-49.  Count II of the complaint also relies on 14 CFR Part 139 and alleges negligence of both OKC and the USDA.  Id., ¶¶ 67-97 (incorporating the allegations in ¶¶ 1 through 49).  As shown by this brief summary, the consideration of the sufficiency of plaintiffs' claims against the USDA at this point is complicated somewhat by the interplay between plaintiffs' claims against OKC and the USDA and the overlapping nature, and bootstrapping to a certain extent, of the complaints' factual allegations against these distinct parties.

---

[2] The citation is to 14 C.F.R. § 139.337(b)(4).

For purposes of the present motion, the court is concerned with the sufficiency of the claims against the USDA (which, as noted previously, is also referred to by the parties as "Wildlife Services" or "WS"). With respect to their claim for negligence against the USDA, plaintiffs contend that USDA's "duty" – a necessary element of their negligence claim – "arises from its contract with OKC, as the airport's owner, to perform OKC's wildlife risk mitigation obligations, which it failed to do." Response, Doc. No. 47, p. 5. The pertinent documents evidencing the contractual relationship between OKC and the USDA are attached as exhibits to the government's Motion to Dismiss and the court has carefully reviewed these key documents, as well as all the other exhibits properly submitted. Because USDA's duty is derived solely from the contract, the court looks closely at the contractual terms themselves in light of the allegations of the complaint.

Courts have recognized that the government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees. *See* Kiehn v. United States, 984 F.2d 1100, 1106 (10th Cir. 1993). In Kiehn, the plaintiff had sustained personal injuries when he fell from a cliff in Dinosaur National Monument. Plaintiff alleged that the United States was negligent in its rescue efforts. Based upon the facts in that case, the court found that the decision whether to render emergency assistance was not a matter of judgment or choice because emergency medical services were required, *i.e.*, made mandatory, pursuant to a contract and National Park Service guidelines. Id. However, the court

noted that because the plaintiffs' negligence claim was not based upon *whether* a rescue effort had been made, but instead was based upon the *manner in which the rescue was conducted*, the question properly became whether the method of rescue was protected by the discretionary function exception.  Id. (emphasis added).  The court found that there were no standards for the Dinosaur National Monument employees to follow concerning the method of rescue, noting that "if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception of the Tort Claims Act."  Id. at 1106-07 (citations omitted).  The court found that the Dinosaur National Monument employees were performing their duty without guidance from any ascertainable standard, noting that plaintiff failed to show that the park rangers contravened a statutory, policy, or regulatory directive.  Id. at 1107 and note 11. Significantly, the court refused to impose a standard of "reasonable care" upon the government employees without first addressing the threshold question of whether the decisions made during the rescue operations were protected under the discretionary function exception.  Id. at 1107.  Not only did the court find that the rescue operation involved discretionary judgment, it also determined, under the second step of the Berkovitz analysis, that the search and rescue operations involved considerations of public policy.  Id.  The court then concluded that plaintiff's claim of negligence in the government's rescue operation was thus barred by the discretionary function exception of the FTCA and the claim

was dismissed for lack of subject matter jurisdiction. Id. at 1108.

The court finds the teachings of Kiehn instructive in this case. The court has carefully reviewed the relevant contract language in this case to determine whether any voluntarily assumed contractual obligations impose nondiscretionary duties on the USDA. The Cooperative Agreement Between United States Department of Agriculture Animal and Plant Health Inspection Service (APHIS) Wildlife Services (WS) and Oklahoma City Airport Trust (OCAT), Oklahoma (Exhibit 2 to USDA's Motion to Dismiss, Doc. No. 30-2) ("Cooperative Agreement") provides in Article I as follows:

> The purpose of this Agreement is to provide funds to conduct an operational Wildlife Damage Management (WDM) program for the protection of human health and safety and property damage at Will Rogers World Airport (WRWA) located in Oklahoma and Cleveland Counties, Oklahoma. An Annual Work/Financial Plan will specify the work to be completed by USDA/APHIS/WS (WS) under a cost-reimbursable agreement with OCAT, functioning through the Airport Director at WRWA.

Under Article 3, part a, of the Cooperative Agreement, WS agrees it "will provide WDM services in accordance with the mutually approved Annual Financial/Work Plan as may be amended in writing by and between the parties, WS and OCAT." Doc. 30-2. Article 6 provides that "all WS activities will be conducted in accordance with applicable Federal, State, and local laws, rules, and regulations." Id.

The Annual Financial/Work Plan for the plan period July 1, 2007 – June 30, 2008 ("Annual Plan"), covering the time period of the accident flight, is attached as

Exhibit 3 to USDA's Motion to Dismiss. As shown above, the Work Plan was intended to and does specify the work to be completed by WS pursuant to the Cooperative Agreement. The initial paragraph of the Work Plan, Doc. No. 30-3, provides:

> The United States Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services (WS) Program will implement an operational control program at Will Rogers World Airport (WRWA) located in Oklahoma and Cleveland Counties, Oklahoma (to include Willey [sic] Post airfield located in Oklahoma County, Oklahoma). The purpose of this agreement is to provide funds to conduct an integrated wildlife management program (WDM). The primary goal of the operational program will be to reduce hazards to aircraft associated with wildlife at WRWA. The secondary goal will be to reduce damage to property and natural resources from wildlife. A work plan is attached which specifies the work to be completed by WS under a cost-reimbursable agreement with OCAT. It includes a general description of work to be done and a projected Financial Plan for the project. This plan is subject to modification depending on the WDM needs required at WRWA.

The "Introduction" section of the incorporated Work Plan acknowledges that "WRWA has had several damaging and expensive bird strikes as well as aborted take offs and landings." Noting that WS has contracted to provide "direct control WDM" to many airports throughout the United States to reduce wildlife hazards at those facilities, the Work Plan states that "WS has the expertise, training, and background in WDM to provide these services." Doc. No. 30-3, p. 2 of 4. The "Objectives" section of the Work Plan includes the following list:

> A. To implement a WDM program to control wildlife hazards at WRWA.

10

B. To monitor and control hazardous wildlife getting on or near runways and threatening aircraft at WRWA.
C. Provide for the protection of human health and safety from wildlife damage at WRWA.
D. To implement and maintain an intensive population reduction program for feral pigeons and European starlings using aircraft hangars at WRWA.
E. Assist with any other wildlife related problems, which may arise at WRWA.
F. Develop new strategies and evaluate wildlife hazard trends at WRWA.[3]

The "Goals" of the Work Plan are stated as a "reduction in the loss of resources and the protection of human health and safety are anticipated by implementing a WDM program at WRWA."

The "Plan of Action" provides the following:

WS will assign to WRWA a fulltime Wildlife Biologist for the duration of the annual work plan period, for timely response to wildlife hazards and to implement a WDM program. WS personnel assigned to WRWA will remain under the supervision of the WS. WDM activities will primarily be confined to WRWA boundaries with periodic activities conducted off WRWA where mammals and migratory birds such as egrets and gulls or other species pose hazards to aircraft. WS will provide managerial, technical, and administrative program support and periodic field assistance.

Management techniques for controlling mammals will include all legal methods such as, leghold traps, neck snares, calling and/or shooting, cage traps, and hand capture. WS will adhere to all OCAT, WRWA, and WS policies during control operations. Safety, especially with the use of firearms, pyrotechnics, and chemicals, will be a priority. Only WS, WRWA security, or

---

[3] As noted by USDA, the allegations of negligence in paragraph 91 of the complaint are largely based on the objectives of the Work Plan.

11

other WRWA designated personnel will remove captured animals. WS will be responsible for the application and maintenance of control devices. All capture devices will be set to reduce the likelihood of non-target catches.

Management techniques for controlling birds include cage traps, pole traps, pyrotechnics, air guns, small arms, Avitrol, DRC-1339, hand capture and various exclusion and harassment techniques. WS will be responsible for application of bird toxicants and repellants and will adhere to all State and Federal laws and chemical label restrictions. All pesticides will be stored at the appropriate Pesticide Storage Facility, on WRWA or at a WS facility. WS will keep WRWA personnel abreast of all activities by attending airport wildlife management meetings and generating mutually agreed upon reports. The WS State Office in Oklahoma City (405) 521-4039 will monitor the program.

Doc. No. 30-3, p. 4. The excerpts quoted above comprise almost the entirety of the Work Plan. These somewhat lengthy excerpts are included to demonstrate what is and what is not actually contained within the Work Plan, which "specifies the work to be completed by WS" pursuant to the parties' contractual agreement.

Upon scrutiny of these contractual provisions, the court finds that while the requirement of conducting a WDM program may be considered to be a mandatory one, the record before the court establishes that this requirement was met. The WDM program, which was designed to "include Wiley Post airfield" in the words of the Work Plan, was in existence at the time of the accident.[4] Thus, plaintiffs cannot sufficiently allege a breach of USDA's duty to implement the WDM. The remaining contractual provisions, which describe the way in which the WDM would be carried

---

[4] Since plaintiffs assert that the contract to perform OKC's wildlife risk mitigation obligation is the source of USDA's duty to plaintiffs, it would be hard for plaintiffs to deny that USDA was under contract to conduct a WDM program at the time of the accident.

out, evidence the discretionary nature of USDA's authority to act in controlling wildlife hazards. Plaintiffs have directed the court to no contractual language that would lead the court to believe that the duties imposed by virtue of the operative contracts would be mandatory ones. Although the Cooperative Agreement states that "all WS activities will be conducted in accordance with applicable Federal, State, and local laws, rules, and regulations[,]" Plaintiffs have failed to identify a statute or regulation that restricted USDA employees' discretion in implementing the WDM program under the Work Plan. The court agrees with USDA that the Work Plan itself, as well as the WS directives, allowed employees to exercise considerable discretion in deciding how to implement the WDM program.

For instance, the two-page WS Directive 2.201, attached as Exhibit 5 to USDA's Motion to Dismiss, is replete with statements indicative of the discretionary nature of USDA's wildlife damage management activities: "Decision-making to resolve each human-wildlife conflict should take into consideration a variety of factors, such as authorities, environmental effects, and management strategies."; The WS "Decision Model" is "designed to serve as a useful management tool and meaningful communication instrument; however, it is not intended to require documentation or a written record each time it is used, and it necessarily oversimplifies complex thought processes."; "Methods should be evaluated in the context of their legal and administrative availability and their acceptability based on biological, environmental, social, and cultural factors."; The USDA management

approach "encourages the use of several management techniques rather than relying on a single method."; and, "Consideration of factors such as available expertise, legal constraints on methods used, costs, and effectiveness is essential in formulating each management strategy." Doc. No. 30-5. Given the nature of the prospect of managing wildlife, it is not surprising that the methods for such an endeavor must be discretionary and the applicable directives amply illustrate this. Further, to the extent plaintiffs have relied on statutes that appear to impose obligations upon airport owners or operators, such standards would not apply to USDA, which undisputedly does not own or operate the Wiley Post airport.

Having found that the actions at issue were either contractually met or were ones of discretionary judgment or choice, the court turns to a consideration of the second step of the Berkovitz analysis to determine whether the judgment exercised in this case is of the kind that the discretionary function exception was designed to shield. As set forth above, under this factor, discretionary actions or decisions which are based on considerations of public policy are protected. Here, the stated goal of the Work Plan was the reduction in the loss of resources and the protection of human health and safety. USDA employees exercise considerable discretion in deciding how to implement the WDM program. As shown in WS Directive 2.201, outlined above, the USDA's methods were to be evaluated "in the context of their legal and administrative availability and their acceptability based on biological, environmental, social, and cultural factors" and the consideration of factors "such as

14

available expertise, legal constraints on methods used, costs, and effectiveness is essential in formulating each management strategy." Doc. No. 30-5. The court finds that the discretionary process involved in controlling wildlife hazards inherently involves a balancing of many factors grounded on considerations of public policy. "It is not the court's role to second guess the discretionary decisions of federal employees when such decisions necessarily take into account a myriad of potential policy factors." Kiehn, 984 F.2d at 1107-08 (footnote omitted).

Plaintiffs have failed to sufficiently allege an adequate basis for federal court jurisdiction on its claims against the USDA. For the reasons stated above, plaintiffs' claim for negligence against the USDA is barred by the discretionary function exception of the FTCA. Accordingly, USDA's Motion to Dismiss **[Doc. No. 30]** is **GRANTED**; plaintiffs' claims against the USDA are dismissed with prejudice for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). In the alternative, the plaintiffs' claims against USDA are dismissed for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

Turning to Defendant United States' Motion to Strike Exhibit 3 (National Transportation Safety Board Findings, Conclusions, and Recommendations) to Plaintiffs' Response to the United States' Motion to Dismiss **[Doc. No. 49]**, the court finds that this motion should be and is also hereby **GRANTED.** Plaintiffs' response brief to the USDA's Motion to Dismiss attempts to cite Exhibit 3 for the quotation found on page 12 which states:

> [Wiley Post Airport] receives federal grant-in-aid funding and, thus, was required to conduct, <u>at a minimum</u>, a Wildlife Hazard Assessment. Yet, it failed to do so.

Even without the benefit of USDA's motion to strike Exhibit 3, the court notes with some concern that the quoted excerpt does not appear in Exhibit 3. More significantly, the use in this litigation of any part of the National Transportation Safety Board's Accident Report is prohibited pursuant to federal law. 49 U.S.C. § 1154(b) ("No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."). Thus, plaintiffs' attempted use of the NTSB Aircraft Accident Report is prohibited, and the exhibit (Exhibit 3 to plaintiffs' Response to USDA's Motion to Dismiss [Doc. No. 47]) is accordingly **stricken.** The court also rejects plaintiffs' argument that the NTSB's factual "Survival Factors Specialist Factual Report of Investigation"[5] should be considered in the place of the Accident report since it is not subject to the prohibitions of § 1154(b) and, according to plaintiffs, contains the "same information" cited in the Accident Report. As pointed out by the USDA in its reply brief, however, "the information contained in the factual report Plaintiffs quoted at length in their brief is significantly different from the information in Exhibit 3 to Plaintiffs' Opposition to the Motion to Dismiss." Doc. No. 52, p. 3. The court further agrees with USDA that plaintiffs have failed to show that the exhibits prove that <u>USDA</u>, as opposed to

---

[5] Attached as Exhibit 1 to Plaintiffs' Response to United States' Motion to Strike [Doc. No. 51].

Wiley Post airport or some other entity, had a duty to conduct a Wildlife Hazard Assessment.

Finally, the court briefly considers Plaintiffs/Counter-Defendants Hartman and Sandoval's Motion to Dismiss OKC's Counter Claims for Contribution. As noted by the court file and in OKC's response to this motion, OKC has filed amended counterclaims shortly after the filing of the motion to dismiss. The court file reflects that plaintiffs filed their Answers and Affirmative Defenses to OKC's Amended Counter Claims for Contribution on July 16, 2010 [Doc. No. 48]. Therefore, the court finds that the Motion to Dismiss the original counterclaims **[Doc. No. 41]** should be and is hereby deemed **MOOT.**

In summary, USDA's Motion to Dismiss **[Doc. No. 30]** is **GRANTED** and plaintiffs' claims against the USDA are dismissed with prejudice for the reasons more fully set forth above. Defendant United States' Motion to Strike Exhibit 3 **[Doc. No. 49]** is also **GRANTED**, and plaintiffs' Motion to Dismiss the original counterclaims **[Doc. No. 41]** is deemed **MOOT.**

It is so ordered, this 22nd day of November, 2010.

*Tim Leonard*
TIM LEONARD
United States District Judge