IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

AUDRA HARTMAN, individually,                    )
and as the Personal Representative of the       )
Estate of Timothy Alan Hartman, deceased, and   )
MONIKA C. SANDOVAL, individually,               )
and as the Personal Representative of the       )
Estate of Rickie D. Sandoval, deceased,         )
                                                )
                    Plaintiffs,                 )
                                                )
v.                                              )        Case No. CIV-10-197-L
                                                )
THE UNITED STATES OF AMERICA,                   )
ROBINSON AVIATION (RVA), INC.,                  )
a Foreign Corporation, OKLAHOMA CITY            )
AIRPORT TRUST, a Public Trust, and              )
THE CITY OF OKLAHOMA CITY, OKLAHOMA,            )
                                                )
                    Defendants.                 )

## O R D E R

On March 4, 2008, after departing the Wiley Post Airport ("Wiley Post" or "PWA") in Bethany, Oklahoma, a Cessna Citation jet aircraft bearing FAA registration number N113SH crashed after a collision with one or more American White Pelicans near the southeast end of Lake Overholser in Oklahoma City, Oklahoma. The aircraft struck the subject bird(s) approximately 4 miles from Wiley Post at an altitude of 1700 feet Above Ground Level (AGL); 3,000 feet Mean Sea Level (MSL). The crash fatally injured the pilot-in-command Timothy Hartman, sitting in the left front seat, and Rickie Sandoval, who was sitting in the right front seat. The aircraft had three passengers, who also lost their lives in the crash.

Plaintiffs Audra Hartman and Monika C. Sandoval, as Personal Representatives of the Hartman and Sandoval Estates ("plaintiffs"), are pursuing wrongful death damages for the Estates and survivors.  The three passengers' estates are not involved in this action.  *See* Doc. No. 196, Final Pretrial Report, Brief Preliminary Statement.

Plaintiffs allege that FAA air traffic controller Loyle Coleman was negligent in failing to advise or warn the pilots about one or more primary radar targets which they allege indicated the possible presence of birds in the vicinity of the aircraft's flight path.  Plaintiffs' action against the United States of America is brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80, and alleges negligence on behalf of the Federal Aviation Administration ("FAA").[1]  These claims are properly tried by the court without a jury pursuant to the FTCA.

This matter is before the court on defendant United States of America's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss **[Doc. No. 139]** Plaintiffs filed the Response in Opposition to the motion, and defendant filed its Reply, all of which the court has carefully considered.

---

[1]      Plaintiffs Audra Hartman, individually, and as the Personal Representative of the Estate of Timothy Alan Hartman, deceased, and Monika C. Sandoval, individually, and as the Personal Representative of the Estate of Rickie D. Sandoval, deceased, are referred to in this order as "plaintiffs." Defendant United States of America is referred to as "FAA."  The summary judgment motion filed by Oklahoma City Airport Trust, a Public Trust ("OCAT") and The City of Oklahoma City, Oklahoma ("OKC") [Doc. No. 130] and plaintiffs' Motion for Partial Summary Judgment [Doc. No. 125] are addressed in a separate order.  Plaintiffs' claims against Robinson Aviation (RVA), Inc. need not be addressed in light of the Notice of Settlement by Plaintiffs and Defendant RVA and Withdrawal of Motions filed December 5, 2012 [Doc. No. 149].

Summary judgment is appropriate when the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(a) ("[T]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The party opposing summary judgment may not rest upon the mere allegations or denials of the party's pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it[.]"). The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998). The mere possibility that a factual dispute may exist,

without more, is not sufficient to overcome a convincing presentation by the moving

party.  Allegations alone will not defeat summary judgment.  Cone v. Longmont

United Hosp. Ass'n., 14 F.3d 526, 530 (10th Cir. 1994).  Any doubt as to the

existence of a genuine issue of material fact must be resolved against the party

seeking summary judgment.  In addition, the inferences drawn from the facts

presented must be construed in the light most favorable to the nonmoving party.

Board of Education v. Pico, 457 U.S. 853, 863 (1982).

In a response to a motion for summary judgment, a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary

judgment in the mere hope that something will turn up at trial.  Bryant v. O'Connor,

848 F.2d 1064, 1067 (10th Cir. 1988).  The mere possibility that a factual dispute

may exist, without more, is not sufficient to overcome a convincing presentation by

the moving party.  Allegations alone will not defeat summary judgment.  Cone v.

Longmont United Hosp. Ass'n., 14 F.3d 526, 530 (10th Cir. 1994).  Statements of

counsel are not summary judgment evidence.  Thomas v. Wichita Coca-Cola

Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992).  The court is not required to

search the record to determine what facts might contradict the defendants'

submissions.  Id.

The court's local rule governing summary judgment procedure, LCvR56.1,

provides in subpart (c) that:

> The brief in opposition to a motion for summary judgment (or partial

summary judgment) shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist.  Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed.  All material facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.

Here, FAA has submitted its "Material Facts Which are Not in Genuine Dispute," consisting of 17 numbered paragraphs.  The numbered facts refer with particularity those portions of the record upon which the FAA relies, in accordance with LCvR 56.1(b).

Rather than beginning their opposition brief with a section which contains a "concise statement of material facts to which the party asserts genuine issues of fact exist" as required by LCvR56.1(c), plaintiffs' response begins with a 4-page "Summary of Argument," followed by a "Statement of Contested Facts."  Not only have plaintiffs failed to provide a concise statement of material disputed facts, they failed to follow the procedure required by the court's local rule.  Plaintiffs' "Statement of Contested Facts" does not refer by number to any of FAA's 17 paragraphs contained in its "Material Facts Which are Not in Genuine Dispute."  Also, plaintiffs' "Statement of Contested Facts" does not number each fact in dispute, but consists of three numbered questions (Were the birds depicted? Was the TCW in the correlated mode? Was there a policy?).  Each of these questions is followed by a

5

largely argumentative commentary on the evidence, with no effort to identify which of FAA's facts are specifically controverted.   Plaintiffs' response to FAA's motion is deficient and unworkable since no attempt is even made to tie plaintiffs' list of questions to particular statements of fact submitted by FAA.  The court is under no obligation to search the record for a genuine issue of material fact.[2]  Because plaintiffs' "Statement of Contested Facts" clearly fails to specifically controvert the FAA's statement of "Material Facts Which are Not in Genuine Dispute," the court finds that they are all deemed admitted for purposes of summary judgment pursuant to LCvR56.1(c).[3]

These undisputed facts, established through declarations, deposition testimony and deposition exhibits,[4] demonstrate that the airport traffic tower at the Will Rogers World Airport is operated by the FAA.  FAA's statement of "Material Facts Which are Not in Genuine Dispute," ¶ 2.  A room in the tower equipped with radar scopes used by air traffic controllers to provide services to pilots is called the Oklahoma City Terminal Radar Approach Control facility ("TRACON").  Id.  At the time of the March 4, 2008 accident, Loyle Coleman, an air traffic controller

---

[2]    *See also* LCvR7.1(j) ("Factual statements or documents appearing only in briefs shall not be deemed to be a part of the record in the case, unless specifically permitted by the Court.")

[3]    Although not required to, the court has carefully reviewed the footnoted citations appearing in the context of plaintiffs' "Statement of Contested Facts."  These references are insufficient to raise a genuine issue of fact or to specifically controvert the FAA's numbered statement of Material Facts Which are Not in Genuine Dispute.

[4]    Citations to the record are generally omitted from the court's recitation of the undisputed facts.

employed by the FAA, was working at the Northwest Approach Control Position in the Oklahoma City TRACON.  Id.

The Standard Terminal Automation Replacement System ("STARS") is a system used at TRACONs and towers in conjunction with radar systems such as the ASR-9 to process radar data and display it to air traffic controllers on radar scopes.  Id., ¶ 9.  STARS was developed by Raytheon.  Id.  STARS was installed at the Oklahoma City TRACON and was in use there on March 4, 2008.  Id.

FAA's Exhibit 5 [Doc. No. 133-5] is a photograph showing part of a STARS Terminal Controller Workstation ("TCW").  Id., ¶ 10.  One pushbutton shown in Exhibit 5 is labeled "MAP UNCOR."  Id.  Another pushbutton shown in Exhibit 5 is labeled "UNCOR."  Id.  When STARS at an FAA TRACON, including the Oklahoma City TRACON, is operating with both of these buttons in the off position (that is, not selected/activated), the system is operating in the "correlated mode."  Id.  The default position for both buttons is the "off" position, which results in the system being operated in "correlated mode."  Id.  If either the MAP UNCOR or the UNCOR buttons were to be selected/activated, the system would be operating in the "uncorrelated mode."  Id.  These buttons can be selected/activated by pushing these buttons or by using the auxiliary display control bar.  Id.  STARS is intended by the FAA to be operated by air traffic controllers in the "correlated mode," and it is the standard operating practice of the FAA to operate STARS in the "correlated mode." Id.  This is because using STARS in the "uncorrelated mode" would result in a

7

significant number of uncorrelated targets being displayed on a controller's radar

scope. <u>Id.</u> It would litter the air traffic controller's display with hundreds, if not

thousands of radar returns which would impede the controller's ability to provide

separation services to aircraft. <u>Id.</u> It would interfere with a controller's ability to

control or to see aircraft. <u>Id.</u>

Air traffic controllers are trained how to provide air traffic control services

using STARS in the "correlated mode." <u>Id.</u>, ¶ 11. CBI 57400 is a training course for

air traffic controllers regarding STARS. <u>Id.</u> This training course does discuss the

MAP UNCOR and the UNCOR functions, however, air traffic controllers are not

trained how to provide air traffic control services using STARS in the "uncorrelated

mode." <u>Id.</u> Therefore, air traffic controllers are not expected to operate STARS in

the "uncorrelated mode," and there is no policy or practice requiring them to do so.

<u>Id.</u>

Mr. Coleman was not trained to use either the MAP UNCOR or the UNCOR

button to provide air traffic control services to pilots; he does not use either of these

buttons to provide air traffic control services to pilots; and he did not use either of

these buttons on March 4, 2008. <u>Id.</u>, ¶ 12. STARS is intended by the FAA to be

operated by air traffic controllers in the "correlated mode," and it is the standard

operating procedure to the FAA to operate STARS in the "correlated mode." <u>Id.</u>

STARS is used in the "correlated mode" at the Oklahoma City TRACON. <u>Id.</u> Mr.

Coleman was operating STARS in the correlated mode on the day of the accident.

Id.

A primary radar return/target is produced when a radio signal being transmitted from a radar antenna is reflected back to the radar site by an object in the path of the signal, such as an aircraft.  Id., ¶ 13.  A primary radar return indicates the range and azimuth of the target relative to the radar site.  Id.  A transponder with Mode-C capability is a piece of equipment located in an aircraft which enables air traffic control radar systems to derive information about the aircraft, including its location, altitude and speed.  Id.  Secondary radar returns are derived from transponders.  Id.  The subject aircraft was equipped with a transponder with Mode-C capability.  Id.

FAA's Exhibit 6 [Doc. No. 133-6] is Slide 13 of a PowerPoint presentation prepared by plaintiffs' radar expert, Robert L. Caudle.  Id., ¶ 14.  Eight primary (radar only) tracks are depicted in yellow on Exhibit 6 at the following times[5]: (1) 21:11:00.019; (2) 21:11:09.169; (3) 21:11:13.819; (4) 21:11:32.269; (5) 21:11:41.419; (6) 21:11:50.569; (7) 21:13:32.421; and (8) 21:14:00.022.  Id.  FAA's Exhibit 7, *see* Doc. No. 133, lists data from the PPB (Plot Playback) file regarding these eight primary (radar only) tracks.  Id.  The track state indicator contained in the PPB file, as shown in the tenth column of Exhibit 7, states that the track state for each of these eight primary (radar only) tracks was "tentative" and not "established."

---

[5]      The times are given in Coordinated Universal Time ("UTC").  According to FAA, the subject airplane crash occurred at approximately 2115 UTC. Doc. No. 139, p. 6.

Id.  If the ASR-9 does not categorize a radar return as a correlated target, STARS does not display a primary (radar only) track on an air traffic controller's radar scope in the "correlated mode" unless that primary (radar only) track is established.  Id.  In this case, the ASR-9 did not categorize the returns associated with the eight primary (radar only) tracks depicted in Exhibit 6 as correlated targets.  Id.  Also, as stated, the eight primary (radar only) tracks on Exhibit 6 were tentative and not established. Id.  Therefore, in the "correlated mode," none of the eight primary (radar only) tracks depicted on Exhibit 6 would have appeared on any air traffic controller's radar scope in the Oklahoma City TRACON or in the Wiley Post Tower.  Id.  Mr. Coleman, therefore, had no information about possible bird activity along the flight's path to provide to the pilots or the Wiley Post air traffic controller.  Id.

FAA's Exhibit 8 [Doc. No. 133-7] is page 12-178 from TI 6191.419.  Id., ¶ 15. This manual was prepared by Raytheon and it relates to STARS.  Id.  Regarding a tentative track, Exhibit 8 states in the "Item Description" column: "Report correlates with a track in track file.  Track has not been updated 'N' (from M of N) times."  Id. This refers to a report which can be linked to a previous track in the track file.  This does not mean that a primary (radar only) target with a "tentative track" is a correlated target that will be displayed on an air traffic controller's radar scope when STARS is operating in the "correlated mode."  Id.

Mark Olsen, an FAA employee[6], using the INSTANT program and information from the PPB file, prepared two replays.  Id., ¶ 16.  Primary (radar only) targets and/or tracks are shown in these replays as blue dots without a data block.  One of the replays shows the primary (radar only) targets and/or tracks which would have been displayed on the controller's radar scope in the "correlated mode."  This replay confirms that none of the eight primary (radar only) tracks depicted in yellow on FAA's Exhibit 6 would have been displayed on the air traffic controller's radar scope in the "correlated mode."  Id.  The other replay shows the primary (radar only) targets and/or tracks which would have been displayed on the controller's radar scope in the "uncorrelated mode."  Id.  Both replays also depict the flight path of the subject aircraft.  On the INSTANT replay, starting at 21:15:02, the data block associated with the subject airplane drops four times.  Id.  This would not have occurred on the air traffic controller's radar scope.  Id.

As stated in the Pilot/Controller Glossary of the Aeronautical Information Manual ("AIM"), providing advisories about "bird activity information" is an additional service by ATC.  Id., ¶ 17.  "Additional services are provided to the extent possible contingent only upon the controller's capability to fit them into the performance of higher priority duties and on the basis of limitations of the radar, volume of traffic,

---

[6]     Plaintiffs' recently filed Seventh Motion in Limine (Regarding Mark Olsen) **[Doc. No. 195]** seeking to challenge Mr. Olsen's qualifications as an expert under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) is **denied** as untimely under the court's scheduling order.  Also, plaintiffs' summary judgment response failed to specifically controvert FAA's statement of undisputed facts that are supported by Mr. Olsen's testimony.

frequency congestion, and controller workload.  Id.  The controller has complete

discretion for determining if he/she is able to provide or continue to provide a

service in a particular case. Id.  The controller's reason not to provide or continue to

provide a service in a particular case is not subject to question by the pilot and need

not be made known to him/her."  Id.

The court finds that the undisputed evidence outlined above establishes that it

is standard operating procedure in the Oklahoma City TRACON to operate STARS

in the correlated mode.  Air traffic controllers, including Mr. Coleman, are not trained

on how to provide services using STARS in the uncorrelated mode.  Through their

failure to specifically controvert FAA's undisputed facts, plaintiffs have not disputed

that Mr. Coleman was operating STARS in the correlated mode on the day of the

accident.  There is no legitimate dispute that at the time of the bird strike involving

the subject aircraft, Mr. Coleman had no information from any source indicating the

possible presence of birds along the aircraft's intended flight route.

As demonstrated by the court's summary of the undisputed facts, the

evidence in this case is of a highly technical nature, requiring explanation by expert

testimony.  See Christian v. Gray, 65 P.3d 591, 601-02 (Okla. 2003) ("When an

injury is of a nature requiring a skilled and professional person to determine cause

and the extent thereof, the scientific question presented must necessarily be

determined by testimony of skilled and professional persons.")  Since Plaintiffs'

Statement of Contested Facts cites to no expert testimony supportive of plaintiffs'

12

arguments, it is insufficient to specifically controvert the FAA's Material Facts Which are Not in Genuine Dispute, or even to raise a genuine issue of disputed fact as to these matters.  As pointed out by the FAA, in response to FAA's Material Facts Which are Not in Genuine Dispute, plaintiffs came forward with no evidence from an air traffic control expert that any air traffic controller, including Mr. Coleman, violated the standard of care of a professional air traffic controller.  Plaintiffs' failure to come forward at the summary judgment stage with admissible evidence of a breach of a duty of care is detrimental to their negligence claim in light of the undisputed facts establishing that Mr. Coleman was acting in accordance with his training and FAA's standard operating procedure.

Plaintiffs' theory that a flock of birds was being displayed on Mr. Coleman's radar screen at the time of the bird strike is purely speculative in light of the undisputed facts.  There is not a scintilla of evidence to show that Mr. Coleman's radar display was not configured in the "correlated" mode as is the standard operating procedure of the FAA at the Oklahoma City TRACON.  Plaintiffs' theory that Mr. Coleman should have disregarded his training and the standard operating procedure of the FAA by switching his radar screen to the "uncorrelated mode," is completely unsupported by any evidence.  Although plaintiffs seem to question the existence of the FAA policy to the extent it is not documented in writing, plaintiffs have failed to point to any evidence that would require the policy to be documented in writing.  More importantly, as previously noted, plaintiffs completely failed to

controvert FAA's abundant evidence establishing the FAA standard operating procedure.  The court agrees with FAA that plaintiffs' unsubstantiated theory that Mr. Coleman was negligent for disregarding his training is simply not supported by any evidence and does not create a genuine issue to be tried in this case. Summary judgment in favor of the FAA is appropriate and will be granted.

Alternatively, based upon the uncontroverted facts, the court finds that the FAA's alternative Motion to Dismiss for lack of subject matter jurisdiction under the discretionary function exception to the FTCA should be granted.[7]  Under the Federal Tort Claims Act ("FTCA"), the United States is liable in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. § 2674. The United States is liable for damages caused by the negligent wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  28 U.S.C. § 1346(b).  The court is to apply the substantive law of the place where the act or omission occurred.  The substantive tort law of the state of Oklahoma would apply in this action with respect to plaintiffs' tort claim.  To establish negligent liability for an injury under Oklahoma law, plaintiffs must prove that (1) defendants owed them a duty to protect them from injury, (2)

---

[7]     FAA's alternative motion is premised on Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  The parties' combined submissions have referred to matters outside the pleadings.  To the extent the court should treat this motion as a Rule 56 motion for summary judgment, it has done so.

defendants breached that duty, and (3) defendants' breach was a proximate cause of plaintiffs' injuries.  Inglehart v. Bd. of County Comm'rs of Rogers County, 60 P. 3d 497, 502 (Okla. 2002).

The FTCA's waiver of the federal government's sovereign immunity, outlined above, is limited by the discretionary function exception which states that the waiver of immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

In determining the scope of the discretionary function exception, the Tenth Circuit has approved of the two-step test set forth by the Supreme Court in Berkovitz v. United States, 486 U.S. 531 (1988); Kiehn v. United States, 984 F.2d 1100, 1102 (10th Cir. 1993).  The first step of the Berkovitz test requires the court to determine whether the challenged conduct "involves an element of judgment or choice," in which case it is discretionary and falls within the language of the exception, or whether it involves "a federal statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow," in which case the exception does not apply.  Id., citing Berkovitz, 486 U.S. at 536.  If the conduct involves discretionary judgment under the first step of Berkovitz, then the court applies the second step, which requires the court to "determine whether that judgment is the kind that the discretionary function exception was designed to

shield." Id.  The exception protects only those discretionary actions or decisions which are "based on considerations of public policy."  Id., *citing* Berkovitz at 537. The purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  Id., *citing* Berkovitz at 536-37 (further quotation omitted).

The type of radar equipment the FAA uses to provide air traffic control services to pilots, the mode in which the equipment is operated, the information displayed on the air traffic controller's radar screen, and the training given to air traffic controllers regarding the use of the equipment clearly involve policy-based judgments that are of the type that the discretionary function exception to the FTCA was designed to shield from liability.

Plaintiffs state that they "do not challenge: regulations; the design of airspace in the OKC area; the FAA's decision to use ASR-9 radar; its choice of STARS TCW's; its decisions not to use avian radar in Oklahoma City; its decision to purchase other safety equipment; its decisions on how to train controllers; or even its decision to implement a [Wiley Post] departure procedure that takes aircraft directly over the bird-infested lake."  Doc. No. 156, p. 30.  Plaintiffs state that their "claims are limited to the fact that one controller made a careless choice in his use of equipment and information that the FAA had decided to purchase, install, and train him to use."  Id.  However, the Tenth Circuit has explained that the

discretionary function exception affords protection for "day-to-day" operational

decisions which are policy-based.  Redmon v. United States of America, 934 F.2d

1151, 1154 (10th Cir. 1991), citing  United States v. Gaubert, 499 U.S. 315, 111

S.Ct. 1267, 1275-76, 113 L.Ed. 2d 335 (1991).  Here, the court has found it to be

uncontroverted that FAA's policy is to operate STARS in the correlated mode in the

Oklahoma City TRACON.  It is also established as undisputed that air traffic

controllers, including Mr. Coleman, are not trained on how to provide services using

STARS in the uncorrelated mode.  Mr. Coleman's actions on March 4, 2008, taken

in accordance with FAA's standard operating procedure and his training, are

protected by the discretionary function exception.

In summary, the United States of America's Motion for Summary Judgment

or, in the Alternative, Motion to Dismiss **[Doc. No. 139]** is **GRANTED.**  Judgment

will issue on a separate document in accordance with the Federal Rules of Civil

Procedure.

It is so ordered this 8th day of February, 2013.

TIM LEONARD
United States District Judge